424 So.2d 1009 (1982)
STATE of Louisiana
v.
Floyd QUEBEDEAUX.
No. 82-KA-0072.
Supreme Court of Louisiana.
November 29, 1982.
*1010 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Bernard E. Boudreaux, Jr., Dist. Atty., J. Phil Haney, Asst. Dist. Atty., for plaintiff-appellee.
Keith Comeaux, New Iberia, for defendant-appellant.
CALOGERO, Justice.
Defendant appeals his conviction by a six member jury of simple burglary in violation of La.R.S. 14:62 and his sentence to twelve years at hard labor. He argues that the trial judge erred in denying his motion for a new trial based on newly discovered evidence, and also that his twelve year sentence is excessive. Because the record does not reflect that the trial judge took into account any mitigating circumstances before imposing the maximum sentence allowed under La.R.S. 14:62, we vacate the sentence and remand the case to the district court for resentencing. The conviction is affirmed.
By bill of information, the state charged defendant Floyd Quebedeaux with the December 15,1980, simple burglary of Kaizer's Place.[1]
At trial the state adduced the following information. Jean "Kaiser" Perez closed his pool hall, located near Breaux Bridge, Louisiana at 2:00 a.m. on December 15, 1980. Between then and 5:00 a.m., the rear window was removed and a microwave oven, a Magnelite pan, a rice cooker, boudin sausage and other items were stolen.[2]
A Louisiana state trooper had been parked in the vicinity on the shoulder of the road around 4:25 a.m. the same morning writing accident reports. He noticed a truck parked in front of the pool hall. The truck's driver exited and walked toward Kaiser's. For a time he was out of sight behind some tall grass but then a person returned to the truck, put something in the rear and climbed into the driver's side. Another person came from the building, also placed something in the rear of the truck and entered the truck on the passenger side. As the truck started and drove past, the trooper saw more definitely that it was a blue Ford with two white males inside. The trooper followed the truck. A check on the license number indicated that the truck was registered to defendant, Floyd J. Quebedeaux of Route 2, Box 344, Arnaudville, Louisiana. An inspection of Kaiser's revealed that the front door lock had been damaged and the rear window had the glass completely broken out.
*1011 When the Sheriff's Department took over the investigation, Deputy Romero and others went to the defendant's neighborhood. Quebedeaux's blue Ford pick-up was parked in his driveway. After the deputies had been watching the house for about thirty minutes, the defendant emerged and drove the truck over to ask the deputies what was "going on." It was then that Romero saw the Magnalite pan and rice cooker in the rear of Quebedeaux's vehicle. Deputy Frederick advised defendant of his rights.
Defendant told the deputy that he and his wife had picked up his brother-in-law in Baton Rouge three days earlier and had returned with the items in the truck. He also said that he and his brother-in-law, Richard Bardsley, had been "headlighting" rabbits at about 2:00 or 2:30 a.m. that morning near Breaux Bridge and that a state trooper had followed them.
After trial, a jury returned a verdict of guilty. Following his conviction and prior to sentencing, defendant filed a motion for a new trial alleging the discovery of newly found evidence. After a hearing, the trial judge denied the motion for a new trial. Thereafter the judge sentenced defendant to twelve years at hard labor.

ASSIGNMENT OF ERROR NO. 1
By this assignment of error defendant contends that the trial court erred in denying his motion for a new trial.
Attached to defendant's new trial motion was an affidavit by his brother-in-law, Richard Bardsley. In this affidavit, Bardsley (who was charged with defendant for the burglary in this case) stated that he and defendant had gone looking for jobs in the afternoon. They had stopped at a lounge (Theriot's) in Breaux Bridge where Quebedeaux had met friends and begun playing cards. Bardsley became bored and wanted to go "spotlighting." Defendant told him to take the truck, fill it with gasoline so there would be enough to go job-hunting the next day, and go on without him. Since Bardsley did not know where to get gasoline "at that late hour", someone at the bar offered to go with him. If Bardsley did not return to the bar before closing time, Quebedeaux said he would hitch a ride home.
The affidavit continues that Bardsley and the unidentified man who left with him drove to a place in Church Point where the hunting was supposed to be good. Bardsley shot nine rabbits and headed back toward Breaux Bridge. On the way a rabbit ran across the road. To get one last rabbit, Bardsley stopped the truck, got out and followed the rabbit on foot. Bardsley entered the rear of a building where a window and frame had been dismantled. On the way out, he took a rice cooker and a pot which he then put in the rear of the truck. Bardsley's affidavit states that the other man was driving the truck at this time but after Bardsley put the things in the back of the truck, they switched places and Bardsley resumed driving. On the way back to Arnaudville, Bardsley's companion indicated that he thought that they were being followed. Bardsley dropped off the unidentified man and continued to defendant's house where he hid the rabbits and knocked on the door. When Quebedeaux answered the door, Bardsley told him about the rabbits and about being followed by the state trooper. The defendant became angry so Bardsley "thought it best not to discuss anything else." When the defendant was "picked up on suspicion of burglary," Bardsley explained in the affidavit that he had been afraid to tell anyone about the events. Now, however, it bothered him that his brother-in-law had been found guilty of something he had not done.
At the hearing on the new trial motion, Bardsley took the stand but pleaded the fifth amendment.[3] The notary before whom the affidavit was signed identified Bardsley as the man who had signed it in her presence. Mrs. Quebedeaux, defendant's wife, also testified at the hearing, (defendant having waived the inter-spousal privilege of La.R.S. 15:461). Mrs. Quebedeaux stated that she had accompanied Bardsley, her sister's husband, to the notary's *1012 office where he signed the affidavit. Mr. Daniel Guidry, an assistant district attorney, testified that before trial Quebedeaux wrote in a letter to the district attorney that he and Bardsley had been hunting rabbits the night of the burglary and that they had been followed by the State Police. Following this testimony, the trial judge continued the hearing.
When the hearing resumed, Bardsley decided to testify on behalf of Quebedeaux. Bardsley's initial testimony recounted the same sequence of events as had his affidavit. Additionally, he admitted that he had been convicted of receiving stolen goods, but denied having served time in the penitentiary. Bardsley also said that while he and defendant initially had the same attorney he had never revealed to the attorney that he, not the defendant, had committed the burglary.
Upon cross-examination, Bardsley could not remember the names of any of the people he and defendant had seen in Theriot's Lounge; neither could he remember places they had gone to look for jobs or the people with whom they had spoken. He explained that Quebedeaux knew the people and had done the talking. He and defendant left home about 9:30 a.m. and arrived at Theriot's around 1:00 p.m. or 2:00 p.m. in the afternoon. From then until 1:00 a.m. the next morning, according to Bardsley, he drank beer, talked with people and shot pool, and watched Quebedeaux play cards. When Bardsley left Theriot's, he did take someone with him to show him the way to Lafayette to buy gasoline but he did not know the man's name. After buying gasoline, the two returned to Breaux Bridge to hunt rabbits.
On further cross-examination, Bardsley said that he had told defendant about hunting and about taking the Magnalite pan and the rice cooker from the building. He also said that he had told the attorney who initially represented him and defendant "the same which is statedwell in my statement." On re-direct examination, Bardsley said that he had been available to testify at defendant's trial and would have done so.
In denying the new trial motion, the trial judge found the allegedly newly discovered evidence to be "incredible, to say the least," although admittedly Bardsley had put himself in a precarious position since he still faced trial on the burglary charge for this same incident.[4] The judge found it hard to believe that Bardsley had spent three or four hours "spotlighting rabbits" with a total stranger without any idea of the man's name. If Bardsley's testimony were correct and defense counsel knew about this story, the judge then found it equally hard to believe "that an attorney would not have taken advantage of such information to look up witnesses who could have established the innocence of Floyd Quebedeaux." Any one of several people could have been called at trial to confirm this story. Such people include the co-participant in the rabbit hunt or those with whom Quebedeaux played pool and cards until all hours of the night. The court also found it unlikely that defendant, as related by Bardsley, would have given up his truck to his brother-in-law while he was about fifteen miles from home with only the prospect of hitchhiking should Bardsley fail to return. Added to this was the assistant district attorney's testimony about the letter wherein Quebedeaux alleged that he went rabbit hunting with Bardsley the night of the burglary. In summary, the judge stressed that were this story true, Quebedeaux would surely have produced witnesses confirming his playing cards at Theriot's Lounge on the night the crimes were committed elsewhere, if not as well, evidence confirming his loan of the truck and perhaps the departure of Bardsley and his unidentified companion.
*1013 The trial judge properly denied defendant's motion for a new trial. When a motion for a new trial is based upon newly discovered evidence, the defendant has to show that the evidence could not have been discovered before or during trial through the exercise of reasonable diligence. La.C.Cr.P. art. 851(3); State v. Fuller, 414 So.2d 306 (La.1982); State v. Simms, 410 So.2d 1040 (La.1982). The ruling on the motion for a new trial is committed to the sound discretion of the trial judge and will not be disturbed on appeal unless there is a clear showing of abuse of that discretion. State v. Fuller, supra; State v. Talbot, 408 So.2d 861 (La.1981) (On rehearing); State v. Spell, 399 So.2d 551 (La.1981); State v. Manning, 380 So.2d 54 (La.1980).
The evidence that defendant claims is newly found is the testimony (and affidavit) of Bardsley attesting that he committed the burglary while defendant remained at Theriot's Lounge. However, at the hearing on the new trial motion, Bardsley said he had informed defendant's trial attorney that he, not Quebedeaux, had committed the offense. This alone, if true, disqualifies the evidence as newly discovered.
On the other hand, even if one assumes that Bardsley was confused about telling his story to the defense attorney, and if one further assumes that Bardsley's basic testimony about the evening is true, the evidence that Bardsley had defendant's truck at the critical time is not new. In the latter event defendant knew that he had loaned his truck to his brother-in-law. Defendant knew that he was playing cards at Theriot's and could have called one of the other players to testify as to his whereabouts. According to Bardsley, defendant even knew the person who had accompanied Bardsley to buy gasoline.
In State v. Motton, 395 So.2d 1337 at 1350 (La.1981), we affirmed a trial court's denial of a motion for a new trial when the "witnesses could have been procured with the exercise of the slightest diligence." Such a denial is equally applicable here. Of any number of people present in Theriot's Lounge that evening, no one was called to testify at trial.[5]
In this case, the credibility of the defendant's brother-in-law Bardsley and his affidavit is also at issue. On review, great weight is given to a trial judge's determination of credibility because he is in the best position to observe the demeanor of the witness. State v. Willie, 410 So.2d 1019 (La.1982); State v. Rodrigue, 409 So.2d 556 (La.1982); State v. Campuzano, 404 So.2d 1217 (La.1981).
The defendant has not carried the burden of showing that the "newly discovered evidence" could not have been discovered before trial.[6] Therefore this assignment is without merit.

ASSIGNMENT OF ERROR NO. 2
By this assignment, defendant contends that the trial judge erred in imposing an excessive sentence.
The trial judge imposed the maximum sentence for simple burglarytwelve years at hard labor. In imposing sentence, the judge referred to defendant's past convictions[7] *1014 and especially to the defendant's application for a new trial, calling it "a mockery of our criminal justice system." The judge considered "the entire motion was a spurious effort at reading the law and showing total disrespect for the law and all of its processes." For these reasons, he concluded that there was an undue risk that defendant would commit other crimes during a period of a suspended sentence or probation, that the defendant was in need of a custodial environment and that a lesser sentence would deprecate the seriousness of the crime. On his own behalf, the defendant stated that he had no control over what Bardsley did. The judge then sentenced defendant to the maximum permitted for simple burglary, twelve years at hard labor. This sentence Quebedeaux challenges as excessive.
A trial judge is vested with wide discretion in imposing sentence. State v. Tilley, 400 So.2d 1363 (La.1981); State v. Daranda, 398 So.2d 1053 (La.1981). Nevertheless, this discretion is not unbridled. State v. Jones, 398 So.2d 1049 (La.1981); State v. Sepulvado, 367 So.2d 762 (La.1979). When considered in light of the particular defendant and the circumstances of the particular crime, a sentence may be found to be excessive even if it falls within the statutory limit. State v. Forshee, 395 So.2d 742 (La.1981); State v. MacDonald, 390 So.2d 1276 (La.1980); Sepulvado, supra.
This Court has stated that maximum sentences are reserved for cases involving the most serious violations of the charged offense and for the worst kind of offender. Jones, supra. In the instant case, this Court does not have an adequate record to determine whether this defendant is "the worst kind of offender." Jones, supra. To begin with in regards to the judge's comments on the motion for a new trial, truthfulness (or lack thereof) is "not [in and of itself] an acceptable basis for a relatively harsh penalty imposed on [a] defendant." State v. Smith, 407 So.2d 652 (La.1981), State v. LaFleur, 391 So.2d 445 (La.1980).
And while we are not prepared to say that a man with the defendant's record without significant mitigating circumstances might not still qualify as one of the "worst kind of offender[s]" for whom the maximum sentence is reserved, the problem here is that it is not evident from the transcript that the trial judge did consider and properly weigh the mitigating factors against the aggravating factors.
The trial judge need not state for the record his consideration of each of the aggravating and mitigating circumstances enumerated in La.C.Cr.P. art. 894.1. The record, however, must reflect that the judge did consider these guidelines in particularizing the sentence to the defendant. State v. Guiden, 399 So.2d 194 (La.1981). The sentencing record, therefore, should reflect that the trial judge did consider not only the seriousness of the crime and the past criminal history of the defendant, but also defendant's personal history (age, mental status, dependents, family ties, employment record, emotional and physical health) and his potential for rehabilitation. Jones, supra; State v. Molinet, 393 So.2d 721 (La. 1981); State v. Jackson, 360 So.2d 842 (La. 1978).
It seems likely that there were in this case some mitigating circumstances. Apparently Quebedeaux is a diesel and gasoline engine mechanic in his mid-thirties who has worked in oilfield related jobs for a number of years. He has a wife and children who depend upon him for support. His only prior felony conviction is for simple burglary which took place some thirteen years earlier when he was probably about nineteen years old. Defendant's prior record *1015 also shows a ten year span without conviction (1967-1977) and, overall, only a pair of misdemeanor convictions after his 1967 burglary conviction. The judge mentioned no mitigating factors at sentencing.
Because the judge did not sufficiently articulate the reasons for and against imposing the maximum sentence as directed by La.C.Cr.P. art. 894.1, we find it necessary to vacate the defendant's sentence and have him resentenced accordingly.

Decree
For the foregoing reasons, the defendant's conviction is affirmed, his sentence to twelve years at hard labor is vacated and the case is remanded to the district court for resentencing.
SENTENCE VACATED AND CASE REMANDED FOR RESENTENCING.
WATSON, J., concurs but would not remand for resentencing.
LEMMON, J., dissents from setting aside the sentence.
NOTES
[1] The bill of information also charged one Richard Bardsley with the same crime.
[2] The sheriff's department returned the Magnalite pan and the rice cooker about noon that day, but the other items were never recovered. The estimated value of the stolen items was $1,800.00.
[3] Bardsley had not yet been tried for the burglaries with which he had been charged.
[4] Bardsley later pled guilty to simple burglary and was sentenced to serve three years at hard labor. This sentence was suspended and Bardsley was placed on two years' probation on the condition that he serve six months in the parish jail and that he attend (under the direction of his probation officer) the Acadiana Mental Health Center upon his release from the parish jail.
[5] This case is similar to State v. Bell, 377 So.2d 275 (La.1979). Bell had defended against an armed robbery charge by alleging that he was so drunk he did not remember what had happened. In his motion for a new trial, Bell stated that he had three witnesses who had seen him on the night of the offense and would testify that he was drunk. In rejecting this as sufficient ground to grant a new trial, the Court noted supra at 280:

In the present case reasonable diligence on the part of the trial counsel could not be established to meet that requirement for a new trial. Defendant knew which bars he had entered early in the evening and finding the bar owners or the several patrons who were drinking with him would present no insurmountable problem. These witnesses could have been procured with the exercise of the slightest diligence.
[6] The trial judge did not consider the second requirement of La.C.Cr.P. Art. 851(3), that the evidence, if presented at trial, would have changed the verdict of guilty. This second consideration only comes into play if the evidence meets the threshold requirement of being newly discovered.
[7] Defendant had juvenile delinquency adjudications in 1962 and 1964, a misdemeanor conviction in 1966 for theft for value less than $20, and then in 1967 his only prior felony conviction for two counts of simple burglary, when he was probably around nineteen years old. His record shows no convictions of any sort for an eleven year period through 1977 when he had a misdemeanor conviction for hit and run and at some unspecified time thereafter, a deferred sentence and unsupervised probation for a misdemeanor conviction for simple battery.